NANCY HENSLEY, DIANE KENT, AND CLEAN WATER FOR NORTH CAROLINA, INC.,
PETITIONERS v. NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NAT-
URAL RESOURCES, DIVISION OF LAND RESOURCES, RESPONDENT, AND MOUN-
TAIN AIR DEVELOPMENT CORPORATION, RESPONDENT-INTERVENOR

No. 525A09

(Filed 27 August 2010)

**1. Environmental Law— Sedimentation Pollution Control Act—trout waters—golf course construction**

The purpose of the Sedimentation Pollution Control Act is to minimize sedimentation resulting from land-disturbing activity and not simply to regulate the land-disturbing activity itself. The N.C.G.S. § 113A-57(1) requirement that any "land-disturbing activity" within a trout waters buffer zone must be "temporary" and "minimal" refers to the effects of sedimentation resulting from the activity and not to the entire scope of the activity. Rather than prohibiting development that encroaches on trout waters buffers, N.C.G.S. § 113A-57(1) aims to ensure that such development is undertaken only in a manner that minimizes sedimentation.

**2. Environmental Law— Sedimentation Pollution Control Act—trout waters—construction of golf course—conditions**

A variance under the Sedimentation Pollution Control Act for construction of a golf course in a trout waters buffer zone had particularly stringent conditions that minimized sedimentation during construction.

**3. Environmental Law— Sedimentation Pollution Control Act—trout waters—construction of golf course—maintenance—variance**

Mountain Air Development properly applied for the necessary variance to conduct construction activity in a trout waters buffer zone, and DLR complied with the statutory requirements in granting the variance. Periodic maintenance after the end of construction of a golf course in a trout buffer zone is not a violation of the "temporary" requirement of N.C.G.S. § 113A-57(1); this construction of the statute would essentially ban permanent development near trout waters, which contradicts the Sedimentation Pollution Control Act's stated purpose.

**4. Environmental Law— Sedimentation Pollution Control Act—trout waters—construction of golf course—summary judgment**

　　There was no genuine issue of material fact as to whether construction of a golf course in a trout waters buffer zone violated N.C.G.S. § 113A-57(1) where the testimony from the primary source of evidence on the project's factual compliance was too general and speculative to create an issue of fact about whether the sedimentation effects of the work were sufficiently temporary or minimal.

　　Justice HUDSON dissenting.

　　Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, —— N.C. App. ——, 685 S.E.2d 570 (2009), reversing an order entered on 2 July 2008 by Judge W. Osmond Smith in Superior Court, Wake County, and remanding to the trial court for entry of summary judgment in petitioners' favor. Heard in the Supreme Court on 24 March 2010.

　　*Southern Environmental Law Center, by J. Blanding Holman, IV, Julia F. Youngman, and Geoffrey R. Gisler, for petitioner-appellees.*

　　*Roy Cooper, Attorney General, by Rufus C. Allen, Assistant Attorney General; and Sueanna Sumpter and Kathryn Jones Cooper, Special Deputy Attorneys General, for respondent-appellant.*

　　*McGuireWoods, PLLC, by Benne C. Hutson; and Smith Moore Leatherwood LLP, by Ramona Cunningham O'Bryant, for respondent-intervenor-appellant.*

　　*William L. Richards for Blue Heron Whitewater LLC, Endless River Adventures, Inc., and FB Canoe Racing, Inc., amici curiae.*

　　*Duke University School of Law, by James Patrick Longest Jr. and Michelle Benedict Nowlin, for Catawba Riverkeeper Foundation, Inc., North Carolina Wildlife Federation, Pamlico-Tar River Foundation, White Oak-New Riverkeeper, Western NC Alliance, Yadkin Riverkeeper, American Whitewater and North Carolina Trout Unlimited, amici curiae.*

NEWBY, Justice.

The question before the Court in this case is whether respondent North Carolina Division of Land Resources ("DLR") properly issued to respondent-intervenor Mountain Air Development Corporation ("Mountain Air") a variance from the trout waters buffer requirements of N.C.G.S. § 113A-57(1). Because we hold that the variance complied with the statutory restrictions, the decision of the Court of Appeals is reversed.

Mountain Air is the developer and owner of Mountain Air Country Club, a residential community in Burnsville, North Carolina. As part of this development, Mountain Air has constructed an eighteen-hole golf course, a lodge, condominiums, individual residences, and other amenities for the community. At some time before August 2002, Mountain Air decided to build an additional nine holes on the golf course ("the Project"), which involved construction of fairways and cart paths over and adjacent to streams on the property. Because a portion of the Project would involve encroachment into the buffer zone for Banks Creek, a stream classified as "trout waters" under 15A NCAC 2B .0304(a), Mountain Air was required to seek from DLR a variance from the buffer requirements for such waters. N.C.G.S. § 113A-57(1) (2009).

On 8 August 2002, Mountain Air submitted to DLR a request for a trout buffer variance. Mountain Air held its initial meetings with DLR in March and June of 2002 and, in response to. DLR questions and comments, supplemented its request to DLR on the following dates: 15 August 2002, 3 February 2003, 27 March 2003, 8 April 2003, 3 June 2003, and 6 August 2003. On 14 October 2003, after well over a year of extensive negotiations with DLR, Mountain Air obtained the required variance ("the Variance"). The Variance allowed Mountain Air to remove the tree canopy along 2763 feet of the stream, clear 160 feet of buffer vegetation, and temporarily enclose and relocate stream segments within the buffer before permanently enclosing 1868 feet of the stream in pipes. Further, although neither Mountain Air's final proposal nor the Variance addresses future upkeep, we can naturally assume that Mountain Air will wish to conduct periodic golf course maintenance within the buffer zone.

In addition to the Variance, the Project required a Wetlands Permit from the United States Army Corps of Engineers pursuant to 33 U.S.C. § 1344 and a Water Quality Certification from the North Carolina Division of Water Quality ("DWQ") pursuant to 33 U.S.C.

§ 1341. Mountain Air acquired both of these before DLR granted the Variance. Mountain Air was able to obtain the Water Quality Certification because DWQ determined that the Project would comply with State water quality standards. Shortly after DLR granted the Variance, Mountain Air also obtained approval of an erosion control plan as required by N.C.G.S. § 113A-54.1.

Petitioner Clean Water for North Carolina, Inc. is a public interest organization headquartered in Asheville that provides support to local community efforts related to water quality. The organization's members, including the two individual petitioners, Nancy Hensley and Diane Kent, reside adjacent to or in close proximity to Mountain Air's proposed golf course development. Petitioners filed a petition for a contested case hearing in the Office of Administrative Hearings on 12 November 2003, alleging that the activities allowed by the Variance would have a "significant and adverse impact" on petitioners "and on their families, the use and enjoyment of their property, and their economic interests primarily from pollution in Banks Creek and loss of fish habitat." Mountain Air filed a motion to intervene, which was allowed on 8 January 2004.

Petitioners and respondents filed cross-motions for summary judgment and joint stipulated facts. An administrative law judge ("ALJ") granted partial summary judgment in favor of petitioners and partial summary judgment in favor of respondents.[1] Following the ALJ's order, the parties moved for reconsideration and for certification to the Sedimentation Control Commission ("the Commission"). On 19 January 2007, the Commission issued its final agency decision, reversing the ALJ's decision to grant partial summary judgment to petitioners and affirming the ALJ's decision to grant summary judgment to respondents. Petitioners sought judicial review of the final agency decision in Superior Court, Wake County, and Mountain Air agreed to limit activities within the trout waters buffer until a hearing on the merits of the petition. The superior court affirmed the Commission's decision and entered summary judgment for respondents. On appeal, a divided panel of the Court of Appeals reversed the order of the superior court and remanded for entry of summary judgment in favor of petitioners. *Hensley v. NCDENR*, —— N.C. App. ——, ——, 685 S.E.2d 570, 587 (2009). Respondents appealed to this Court on the basis of the dissenting opinion in the Court of Appeals.

---

1. The ALJ denied all summary judgment motions on other allegations in the petition "on the ground that genuine issues of material fact remain for hearing." These matters are still pending before the ALJ.

[1] Article 4 of Chapter 113A of the General Statutes, known as the Sedimentation Pollution Control Act of 1973 ("the Act"), addresses the State's problem of sedimentation pollution. The Act's preamble provides:

> The sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem. Sedimentation occurs from the erosion or depositing of soil and other materials into the waters, principally from construction sites and road maintenance. The continued development of this State will result in an intensification of pollution through sedimentation unless timely and appropriate action is taken. Control of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare, and expenditures of funds for erosion and sedimentation control programs shall be deemed for a public purpose. *It is the purpose of this Article to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from pollution by sedimentation.* In recognition of the desirability of early coordination of sedimentation control planning, it is the intention of the General Assembly that preconstruction conferences be held among the affected parties, subject to the availability of staff.

N.C.G.S. § 113A-51 (2009) (emphasis added).

The portion of the Act at issue is N.C.G.S. § 113A-57(1), which provides:

> No land-disturbing activity subject to this Article shall be undertaken except in accordance with the following mandatory requirements:
>
> (1) No land-disturbing activity during periods of construction or improvement to land shall be permitted in proximity to a lake or natural watercourse unless a buffer zone is provided along the margin of the watercourse of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer zone nearest the land-disturbing activity. Waters that have been classified as trout waters by the Environmental Management Commission shall have an undisturbed buffer zone 25 feet wide or of sufficient width to confine visible siltation within the twenty-five percent (25%) of the buffer

> zone nearest the land-disturbing activity, whichever is greater. *Provided, however, that the Sedimentation Control Commission may approve plans which include land-disturbing activity along trout waters when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal.* This subdivision shall not apply to a land-disturbing activity in connection with the construction of facilities to be located on, over, or under a lake or natural watercourse.

*Id.* § 113A-57(1) (emphasis added). Specifically, the issue at hand is whether the "land-disturbing activity" that DLR approved in the Variance was "temporary" and "minimal" under section 113A-57(1).

As stated in the preamble, the purpose of the Act is to "permit development of this State to continue with the least detrimental effects from pollution by sedimentation." *Id.* § 113A-51. One method by which sedimentation is controlled is the regulation of "land-disturbing activity," which is defined in the Act as "any use of the land by any person in residential, industrial, educational, institutional or commercial development, highway and road construction and maintenance that results in a change in the natural cover or topography and that may cause or contribute to sedimentation." *Id.* § 113A-52(6) (2009).

The Court of Appeals equated the phrase "said disturbance" in section 113A-57(1) with the definition of "land-disturbing activity" in section 113A-52(6) and failed to distinguish the use of the land from the sedimentation pollution that it might cause. In other words, the Court of Appeals held that whether land-disturbing activity along a trout waters buffer zone is "temporary" and "minimal" depends on the scope of the entire project rather than just the sedimentation effects of the project. We disagree. According to the preamble, the purpose of the Act is to minimize sedimentation resulting from land-disturbing activity and not simply to regulate the land-disturbing activity itself. Each sentence of the preamble refers to sedimentation and the steps that the State must take in order to control the effects of erosion and sedimentation. Given the Act's overriding purpose of controlling sedimentation, we conclude that the "temporary" and "minimal" requirements of section 113A-57(1) refer to the sedimentation effects of the activity and not to the land use in general.

In reaching its holding the Court of Appeals stated that under the Act, "subject to certain limited exceptions, mandatory trout waters

buffer zones shall remain 'undisturbed' in perpetuity, or until such time as the General Assembly decides to enact legislation to the contrary." *Hensley*, —— N.C. App. at ——, 685 S.E.2d at 578. In light of the preamble, which demonstrates that the Act is an antisedimentation law and not an antidevelopment law, this viewpoint overstates the intent and effect of section 113A-57(1). Rather than prohibiting development that encroaches on trout waters buffers, section 113A-57(1) aims to ensure that such development is undertaken only in a manner that minimizes sedimentation. At the General Assembly's mandate, the Commission applies its expertise and grants variances only for projects that take due care to keep sedimentation to a minimum.

We also observe that the Court of Appeals' analysis focused heavily on the word "may" in the provision that defines land-disturbing activity as "any use of the land . . . that *may* cause or contribute to sedimentation." N.C.G.S. § 113A-52(6) (emphasis added). The majority held "as a matter of law" that the periodic maintenance work that Mountain Air will likely wish to perform in the buffer zone along Banks Creek " '*may* cause or contribute to sedimentation,' and thus constitutes ongoing 'land-disturbing activity.' " *Hensley*, —— N.C. App. at ——, 685 S.E.2d at 578. We find this reading of the definition of land-disturbing activity to be overly literal. Virtually any use of land *may* cause or contribute to sedimentation, so the Court of Appeals' interpretation effectively reads the variance provisions of section 113A-57(1) out of the Act. Because those variance provisions were enacted concurrently with the increased protections for trout waters, Act of July 25, 1989, ch. 676, sec. 3, 1989 N.C. Sess. Laws 1867, 1870, we do not believe the General Assembly intended such a result. Rather, we interpret section 113A-52(6) as a more general guide to DLR's discretionary decision whether to grant a variance under section 113A-57(1).

[2] A review of Mountain Air's variance proposal and the conditions of the Variance reveals that the sedimentation effects during the construction of the golf course were minimized. For example, in order to remove trees, Mountain Air had to comply with a myriad of requirements. Before removal, Mountain Air would flag the individual trees it wished to remove and give DLR's representatives an opportunity to inspect the flagged areas. If DLR expressed concern that specific tree removal would have adverse effects on stream coverage, Mountain Air would make appropriate "understory enhancements" before removal. Any trees that were felled were cut above the ground, "leaving stumps and root mass intact," and Mountain Air made efforts to

fell the trees away from the stream bank. Whenever possible, felled trees would be "tied off and lifted directly out of the buffer." Any sub-canopy vegetation would only be removed by hand.

Mountain Air also set forth a thoroughly developed pipe installation strategy. Mountain Air proposed that its workers be divided into teams to reduce the chance of sediment leaving the work site and that those teams be supervised by "a manager who has been certified under the state-sanctioned Clean Water Contractor program." A Sediment Control Crew would maintain "stormwater and sediment pollution control logs." Mountain Air also carefully set forth the order and methods to be used for each specific segment of pipe installation. Likewise, Mountain Air developed detailed plans for equipment access, "energy dissipating plunge pools," rock excavation, seepage, compaction of the land after completion of the Project, and possible overflow of the pipes. To "reduce the already minimal risk of sedimentation," Mountain Air also proposed to monitor the weather forecast on a daily basis and delay or stop any activity if significant rain was forecast for the following twenty-four hour period.

Furthermore, DLR conditioned the Variance's approval on various additional sedimentation pollution controls, which Francis M. Nevils, Jr., Section Chief of DLR's Land Quality Section, described as "particularly stringent." Mountain Air had to monitor the weather forecast three days in advance of any land-disturbing activity, and that activity could not begin if there was a fifty percent chance of more than one-quarter inch of precipitation within twenty-four hours. The workers had to stabilize all disturbed areas in the buffer zone with temporary ground cover at the end of each workday. All materials excavated within the buffer zone had to be deposited outside the buffer and at least twenty-five feet from the top of the stream bank. "A person qualified in erosion and sedimentation control" was required to be present during all land-disturbing activities within the buffer zone. Tree removal could not begin until the site had been stabilized, and Mountain Air was required to use equipment that would minimize disturbance to the area. The approved erosion and sedimentation control plan included "the use of skimmer basins, skimmer traps or flocculant(s) and level spreaders or other means to create dispersed flow where appropriate to reduce sedimentation and turbidity." To protect rainbow trout and their habitat, Mountain Air was prohibited from working in the buffer zone during spawning season.

In short, both Mountain Air's proposal and DLR's "particularly stringent" Variance conditions ensured that erosion and sedi-

mentation were "minimal" during the period of construction along Banks Creek.

[3] In addition to the General Statutes, the Court of Appeals also relied on the administrative regulations of the Department of Environment and Natural Resources in concluding that the Project was not a "minimal" disturbance. Those regulations require written approval from the Director of DLR when a land-disturbing activity in a trout waters buffer zone exceeds ten percent of the total length of the buffer. 15A NCAC 4A .0105(26) (June 2010); *id.* 4B .0125(c) (June 2010). We will assume without deciding that the Project involved activity exceeding ten percent of the length of the buffer zone along Banks Creek and that Mountain Air was required to obtain this written approval. The Court of Appeals concluded that Mountain Air failed to do so and thus violated 15A NCAC 4B .0125(c). However, the letter granting the Variance contains the following language:

> In accordance with N.C. Gen. Stat. 113A-57(1) *and N.C. Admin. Code 15A 4B .0125(c)*, this letter will serve as written approval of the proposed encroachment into the trout water buffer zones, of tributaries to Banks Creek . . . . *This authority has been delegated to me, Francis M. Nevils, Jr., Section Chief, Land Quality Section by James D. Simons, Director, Division of Land Resources, in accordance with N.C. Gen. Stat. 143B-10.*

(Emphases added.) We hold that Mountain Air properly obtained written approval from DLR for its land-disturbing activity in the Banks Creek buffer zone.

The Court of Appeals also held that the Project was not "temporary" because of Mountain Air's presumed need to conduct periodic maintenance activity in the buffer zone after completion of all construction. Again, the court focused on the duration of the activity itself rather than its sedimentation effects. Further, the court's belief that occasional maintenance violates the "temporary" requirement of section 113A-57(1) regardless of whether additional variances are sought would essentially ban any type of permanent development near trout waters. This interpretation contradicts the Act's stated intention of encouraging continued development in this state.

[4] Having determined that the Court of Appeals' reading of the "temporary" and "minimal" requirements was more rigorous than the General Assembly intended, we now consider whether there was any genuine issue of material fact whether the Project violated section

113A-57(1). The primary source of evidence on the Project's factual compliance with section 113A-57(1) was Richard Preston Maas, who has a Ph.D. in Environmental Chemistry and extensive experience working to improve water quality. In his deposition testimony, Dr. Maas expressed his opinions that Mountain Air's activities along Banks Creek were "very likely to cause excessive siltation" and that the sedimentation impact of the Project would be "permanent and substantial." However, Dr. Maas also admitted that he based his opinions solely on previous experience with activities along other trout waters. He stated that the piping of Banks Creek would increase the stream's velocity and cause increased sedimentation, yet admitted that he had never prepared or reviewed any velocity calculations specific to the Project. When asked for his opinion about sedimentation pollution that might occur after completion of construction, Dr. Maas stated, "Well, I may develop an opinion about that, *if and when I visit the site*. But I don't have an opinion on that right now." (Emphasis added.) We conclude that Dr. Maas's testimony was too general and speculative to create a genuine issue of material fact as to whether the Project's sedimentation effects were sufficiently "temporary" or "minimal." We further conclude that when the Court of Appeals stated that the Project "*may* cause or contribute to sedimentation," the court engaged in fact-finding, which is not the role of the appellate courts. *Godfrey v. Zoning Bd. of Adjust.*, 317 N.C. 51, 63, 344 S.E.2d 272, 279 (1986). Particularly given our interpretation of section 113A-52(6) as a basic definition of land-disturbing activity rather than a highly literal rule that serves to ban all such activity in trout waters buffer zones, we find insufficient evidence in the record to justify further fact-finding in this case.

Lastly, we note that DLR's interpretation of the purpose and meaning of section 113A-57(1) is entitled to some judicial deference because the General Assembly made DLR responsible for administering the statute. *Frye Reg'l Med. Ctr., Inc. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (citation omitted). This proposition is still legally sound despite N.C.G.S. § 150B-51(c), which provides that

> [i]n reviewing a final decision in a contested case in which an administrative law judge made a decision . . . and the agency does not adopt the administrative law judge's decision, the court shall review the official record, de novo, and . . . . shall not give deference to any prior decision made in the case.

N.C.G.S. § 150B-51(c) (2009). This Court has held that section 150B-51(c) "refers only to the agency's decision in the specific case

before the court" and that the trial court is not barred from "considering the agency's expertise and previous interpretations of the statutes it administers, as demonstrated in rules and regulations adopted by the agency or previous decisions outside of the pending case." *Rainey v. N.C. Dep't of Pub. Instruction*, 361 N.C. 679, 681, 652 S.E.2d 251, 252 (2007) (per curiam). The record here shows that DLR's interpretation that section 113A-57(1) gives DLR authority to grant variances when the impact from sedimentation will be "temporary" and "minimal" has been consistently applied.[2]

We hold that the requirements of N.C.G.S. § 113A-57(1) that any "land-disturbing activity" within a trout waters buffer zone must be "temporary" and "minimal" refer to the effects of sedimentation resulting from the activity and not to the entire scope of the activity. Mountain Air properly applied for the necessary Variance to conduct construction activity in a trout waters buffer zone, and DLR complied with the statutory requirements in granting the Variance. We also hold that there is no genuine issue of material fact whether the Project violated section 113A-57(1), and thus, respondents are entitled to summary judgment on the issues raised in the instant appeal. Accordingly, we reverse the decision of the Court of Appeals. This case is remanded to the Court of Appeals for further remand to the Superior Court, Wake County, with instructions to that court to remand this matter to the Office of Administrative Hearings for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice HUDSON dissenting.

Because I believe that the majority opinion here reaches a result that is contrary to both the letter and the spirit of the Sedimentation Pollution Control Act (Act) and its trout water buffer provisions, I must respectfully dissent.

The central question before this Court is whether, and to what extent, the changes in land along a trout stream are permitted in furtherance of the expansion of defendant Mountain Air's eighteen-hole graded golf course. Defendants argued, and the majority agrees, that land-disturbing activities including the removal of trees and

---

2. Francis M. Nevils, Jr. testified that in the two years before the date of his deposition, DLR issued "four or five" trout buffer variances. Mr. Nevils further testified that "[t]here was at least one that was comparable" to the Variance issued to Mountain Air.

canopy within the stream buffer and the permanent rerouting and enclosure of the stream within a pipe are not prohibited by N.C.G.S. § 113A-57(1). The majority relies on language in that section that allows the Sedimentation Control Commission to approve plans along trout waters "when the duration of said disturbance would be temporary and the extent of said disturbance would be minimal." Referring to the preamble of the Act, the majority interprets this language as referring not to the use of the land along the stream in general, but only to sedimentation. Based thereon the majority reverses the Court of Appeals and affirms the trial court, holding that the Court of Appeals interpretation was "overly literal."

The majority asserts that the term "land-disturbing activity" applies only to sedimentation and not to the activity itself. However, the statutory language explicitly provides otherwise when it states:

(6) "Land-disturbing activity" means *any use of the land* by any person in residential, industrial, educational, institutional or commercial development, highway and road constructions and maintenance that results in a change in the natural cover or topography and that may cause or contribute to sedimentation.

N.C.G.S. § 113A-52(6) (2009) (emphasis added). The majority simply rewrites this legislative definition, which is not the role of this Court.

I do not agree that the provisions of N.C.G.S. § 113A-57(1) apply only to the period of construction and am of the opinion that the majority in the Court of Appeals interpreted this statute exactly as the General Assembly intended. While the preamble to the statute does indicate that the overall purpose of the Act was to allow development to proceed around the state, it also notes that the General Assembly specifically intended to create a program to minimize the harmful effects of sedimentation pollution. As pointed out by plaintiffs and their amici curiae, the trout water protection provisions were advanced by legislators from the western part of the state, where such waters are located, in order to provide enhanced protection for such waters. The Administrative Law Judge who first issued an opinion in this case agreed, and noted that "prohibition of development in trout stream buffers is exactly the intent of the statute," with the narrow exception for activities that are temporary, with minimal disturbance.

The majority has turned those protections upside down by its decision today. While criticizing the Court of Appeals majority for

"effectively read[ing] the variance provisions . . . out of the Act," the majority here instead reads the *trout water protection provisions* out of the Act. My reading of the statutes and the arguments here leads me to conclude that the General Assembly did indeed intend to restrict development within the twenty-five-foot trout water buffer, while providing ample opportunity for construction of all manner of edifices nearby, even allowing for the buffer area to be disturbed during construction, as long as the disruption is temporary and minimal. Here the project will permanently destroy trees and canopy along the watercourse and will reroute and enclose in a pipe the watercourse itself. These alterations are neither temporary nor minimal. I would affirm the Court of Appeals on this issue.