HUNTER, JR., Robert N., Judge.
Carl Edward Brubach ("Plaintiff") appeals following a jury verdict finding him contributorily negligent and barring him for recovering from Charles Cody Peterson ("Defendant"). On appeal, Plaintiff contends the trial court committed the following errors: (1) denying his motions for directed verdict and judgment notwithstanding the verdict; (2) instructing the jury on reckless driving; and (3) denying his motion for a new trial. We affirm.
I. Factual and Procedural Background
On 29 January 2016, Plaintiff filed a complaint for negligence, gross negligence, and punitive damages. The complaint alleged the following narrative.
On 27 September 2013, around 2:30 a.m., Plaintiff rode his bicycle westbound on Causeway Drive in Wrightsville Beach, North Carolina. After drinking "multiple alcoholic beverages[,]" Defendant drove his car on the same road, in the same direction. Daniel Johnson rode as a passenger in Defendant's car. Defendant drove behind Plaintiff and "perceived the Plaintiff riding his bicycle[.]" Plaintiff "did not stray from his direction or path of travel on the bicycle." Defendant "negligently, carelessly and recklessly" hit Plaintiff and his bicycle from behind. The hit caused Plaintiff to be thrown from his bicycle and suffer injuries.
Defendant did not contact law enforcement or medical assistance, check on Plaintiff, or render any aid to Plaintiff. Law enforcement authorities arrested Defendant and charged him with felony hit and run, failure to see safe movement, resisting a public officer, possession of a schedule II substance, and simple possession of a schedule VI substance. Defendant pled guilty to hit and run, failure to see safe movement, and resisting a public officer.
On 4 May 2016, Defendant filed his answer. Defendant raised the affirmative defenses of, inter alia , ordinary and gross contributory negligence. Plaintiff filed a reply to Defendant's answer on 6 May 2016, denying any contributory negligence or that any alleged contributory negligence proximately caused the accident.
After numerous pre-trial motions, the trial began on 10 April 2017.
Plaintiff first called Andrew Keenan, Plaintiff's roommate in 2013. The two lived together in an apartment in Wilmington, North Carolina. On 26 September 2013, Plaintiff returned from a surfing trip in California "around 8 or 9" in the evening. The two planned to meet friends at the beach to talk about Plaintiff's trip.
Plaintiff and Keenan rode their bicycles on a bicycle path and sidewalk to Wrightsville Beach. Keenan remembered Plaintiff's bicycle having a light on the front and a reflector on the back. After a "relaxed ride[,]" the two arrived at Jerry Allen's Sports Bar and Grill "20 or 30 minutes" later. Keenan saw Plaintiff drink "three or four" beers at Jerry Allen's. Around 12:30 the next morning, the group left, went to the ocean, and swam for "30 minutes or so." They then walked back to Jerry Allen's, and Plaintiff closed his tab at the bar.
Plaintiff seemed "fine to ride his bike home." Had Plaintiff not been "in the right state[,]" Keenan would have stopped Plaintiff from leaving. The two said goodbye and "split up." Later that morning, another friend told Keenan a car hit Plaintiff and Plaintiff was in the hospital.
Plaintiff next called Jacob Laham. On the evening of 26 September 2013, Laham was at Fibbers, a bar off of Wrightsville Beach, with a friend, Evan Barton. Laham did not drink alcohol that evening. Around 2 a.m. on 27 September 2013, Laham and Barton left Fibbers. The two started to walk to Laham's home, located "half a mile, maybe a mile" away. On the walk home, they crossed over the drawbridge from Eastwood Road to Wrightsville Beach. This area "was pretty well lit[.]"
After Laham and Barton walked over the bridge and were "maybe like a quarter of a mile" past the bridge:
kind of just out of nowhere, like out of like-[he] [did]n't know if it was [his] peripherals or [his] instinct, or if [he] saw it or heard it, but it was just kind of like a snap, and then [he] just kind of saw-[he] heard a loud noise and [he] just saw kind of like a tumbling object in the street, or like off the side of the road.
The "tumbling object" was Plaintiff. Although Laham stood "maybe 20 feet ... 30 feet" from the accident, he did not actually see the accident occur.
Laham saw a sports car with a bike rack on the back. The driver tapped the car's brakes, slowed down, but did not fully stop. Laham "started screaming bloody murder," waving his arms, running after the car, and telling the driver to stop. While Laham ran after the car, Barton stayed with Plaintiff. The car still did not stop, so Laham ran after the car, onto the drawbridge. During his chase, Laham called 911 on his cell phone and reported the accident. Based on the manner in which the driver drove the car, it seemed to Laham "[the driver] definitely was getting away."
After the car drove away, Laham went back to Plaintiff and Barton. Laham did not smell "any sign of intoxication" on Plaintiff. Plaintiff "was seriously concussed" and thought Barton and Laham were the ones who hit him.
Officers and an ambulance arrived at the scene. Laham and Barton gave statements of the events to officers. After giving the statements, officers told Laham and Barton they thought they found the car from the accident across town. Laham and Barton rode with officers to a Target store to identify the car. As they arrived at the Target parking lot, Laham "immediately knew it was the car [from the accident]. It was obvious, the bike rack on the sports car."
Plaintiff next called Michael Ryan, an officer with the New Hanover County Sheriff's Office. On 27 September 2013, Officer Ryan completed an incident report, which Plaintiff admitted into evidence without objection.
On 27 September 2013, police dispatch put out a "BOLO" (be-on-the-lookout) for "a vehicle that's coming from Wrightsville Beach, and a black BMW with a bicycle rack." As Officer Ryan turned onto Eastwood Road, he saw a black BMW with a bicycle rack drive past him. He began to watch the car and called dispatch to inform other officers he was behind the "suspect vehicle[.]"
Defendant, the driver, turned onto Market Street, toward downtown Wilmington. Officer Ryan did not immediately turn on his lights and siren because he wanted other officers present, just in case Defendant attempted to drive away. The car touched the dividing line "several" times and went across the lane line two times.
Near the intersection of Market Street and New Centre Drive, Defendant "made an abrupt lane change" and "cut across to the turn lane[.]" Officer Ryan continued following and turned on his lights and siren. Defendant turned on the left-turn signal and then drove into the right lane. He drove past two parking lots, turned on his hazard lights, and finally turned into a Target store parking lot. However, the car "coasted around up into the parking lot, headed back towards Market Street, where he stopped his vehicle." By this time, another officer arrived as backup.
Officer Ryan got out of his police car and walked to Defendant's vehicle. Defendant sat in the driver's seat, and Daniel Johnson in the passenger seat. Officer Ryan asked Defendant for his license and registration. Defendant gave Officer Ryan his license, but Officer Ryan had to ask "several" times for proof of registration. During this, Officer Ryan noticed "a strong odor of an alcoholic beverage." He also saw Defendant's "red, glassy eyes." Officer Ryan asked, "Hey, what happened in Wrightsville Beach tonight?" Defendant responded, "Oh, nothing, I was at a couple bars, had a couple drinks."
Based on the following, Officer Ryan thought Defendant's vehicle was the vehicle from the accident: the description of the car from the BOLO; witnesses' identification of the car; and "[o]n the front passenger side of the vehicle there was scuff marks up along the fender well of the vehicle that looked very recent. Very recent." Officer Ryan asked Defendant to step out of the car, which Defendant did. Although officers asked Defendant to stay at the back of his car, Defendant repeatedly walked around the car to view the damage. One of the times Defendant tried to walk around the car, Officer Ryan "asked him to step back to the vehicle again." Then Defendant "resist[ed] what [officers] were telling him to do." Consequently, Officer Ryan tried to handcuff Defendant, which Defendant fought. After "taking him down to the ground[,]" officers handcuffed Defendant.
Defendant displayed a "roller coaster" of emotions from the time of the stop to his arrest. Officer Ryan also noticed Defendant "had kind of a sway to him." Based on his observations of Defendant, Officer Ryan "believe[d] he was appreciably impaired by an impairing substance[.]" However, Officer Ryan did not conduct a breathalyzer test.
Plaintiff called Eric Lippert, an officer with the Wilmington Police Department. Plaintiff tendered Officer Lippert as a "drug recognition expert under Rule 702."[1] Officer Lippert reviewed the following: "defendant's deposition, the defendant's sworn written discovery, the SBI drug test report, the passenger's deposition, Officer Gowin's, with Wrightsville Beach's, police report, and Deputy Ryan's, with the Sheriff's Department, his incident report." In Defendant's deposition and sworn written discovery, he "admit[ted] to taking Klonopin ;[2] Vyvanse ;[3] alcohol, two to three beers." In Johnson's deposition, he "state[d] that the defendant smoked marijuana, also took a Vyvanse." Two hours after the collision, another officer, Sergeant Gowin, performed a chemical analysis. At that time, Defendant "had a concentration of .02." Officer Lippert opined Defendant's blood alcohol level "was higher than a .02 at the time of the crash." The SBI lap report showed citalopram in Defendant's system, which is a central nervous system depressant. Officer Lippert further opined Defendant "was impaired" at the time of the crash with Plaintiff. Upon being re-called, Lippert opined the presence of central nervous system depressants, other than alcohol, "explain[ed] the four out of six clues that [Defendant] registered on the horizontal gaze nystagmus test [.]"[4]
Plaintiff next called Sergeant Donald Gowin with the Wrightsville Beach Police Department. During the morning of 27 September 2013, Sergeant Gowin assisted in the processing of Defendant. During processing, Defendant told officers he consumed two beers. Sergeant Gowin performed the horizontal gaze nystagmus test on Defendant.[5] During this test, Defendant's movements were "lethargic, very slow[,]" and he made "noncaring" statements. Sergeant Gowin opined Defendant displayed four out of the six clues for impairment.
Around 4:35 a.m., Defendant waived his Miranda rights, in a signed writing. Officers waited to perform any additional tests, because they needed approval of a magistrate. While waiting, officers transported Defendant to the New Hanover County Detention Center. Sergeant Gowin and Officer Smith then inventoried Defendant's car. Sergeant Gowin smelled "a strong odor associated with marijuana[.]" In the glovebox, they found an unlabeled prescription bottle, containing "a substance believed to be marijuana and a white and orange in color capsule, pill."
Plaintiff next called Gunnar Matthews, a corporal with the Wrightsville Beach Police Department. Without objection, Plaintiff admitted Matthews's police report from the accident.
On 27 September 2013, at 2:35 a.m., Corporal Matthews was dispatched to a hit-and-run scene. When Corporal Matthews arrived at the scene, Plaintiff, Laham, and Barton were there. Laham and Barton described the car that hit Plaintiff as a black BMW sedan, with a bicycle rack on the back. Corporal Matthews asked Plaintiff if he was okay. Plaintiff "was conscious but not alert. ... He seemed very out of it, wasn't exactly sure what was going on." Plaintiff did not exhibit any of the signs of impairment, and Corporal Matthews did not smell alcohol on Plaintiff.
Approximately two minutes later, the Wrightsville Beach Fire and Rescue arrived. EMS transported Plaintiff to the hospital. Corporal Matthews collected evidence from the scene and returned to the Wrightsville Beach Police Department. There, Corporal Matthews began the paperwork to book Defendant. After speaking with a magistrate, he charged Defendant with felony hit-and-run.
Corporal Matthews also completed another accident report. Without objection, Plaintiff admitted this accident report into evidence.[6] In the report, Corporal Matthews marked "Alcohol/Drugs Suspected" and noted Defendant had a blood alcohol level of 0.02. However, over time, blood alcohol levels decrease, and he considered the two hours between the wreck and the test to be a "significant amount of time." According to his report, the front of Defendant's car struck the rear of Plaintiff's bicycle. He described the hit as a "direct hit from the rear." For the report, Corporal Matthews prepared the following narrative: "Vehicle 2, a cyclist, was traveling west on Causeway Drive. Vehicle 1 was also traveling west on Causeway Drive and struck Vehicle 2 from behind. Vehicle 1 did not stop to render aid to Vehicle 2 and kept traveling west on Causeway Drive." Corporal Matthews opined the directions of the car and bicycle based on the damage to both and a videotape from a nearby store. Before playing the video, Plaintiff's counsel stated, "I think the parties have agreed to stipulate to the admission of the video at this time." The court replied, "Very well." Plaintiff played the videotape five times. Based on the videotape, Corporal Matthews determined Defendant drove in the right lane. However, Corporal Matthews conceded it was "[p]ossible" Plaintiff could have been swerving on his bicycle.
Defendant complained of injuries resulting from his arrest, so Corporal Matthews transported him to the hospital. There, Defendant and Corporal Matthews spoke. Defendant told Corporal Matthews he had not been involved in any car accident. Defendant also denied "being an escape risk [and] being a suicide risk[.]" However, Defendant did admit to taking Vyvanse. Defendant also said, "he did not drive down the sidewalk to purposely hit [Plaintiff] on his bicycle." However, there is no sidewalk where the accident occurred. Defendant's statement made Corporal Matthews think Defendant "may be impaired." Defendant "[d]idn't have any remorse" and "[s]eemed a little-just a little bit out of it."
After treatment at the hospital, Corporal Matthews transported Defendant to the New Hanover County Sheriff's Office and placed him in custody. While in the holding area, Defendant told Matthews "he saw [Plaintiff] riding down the road weaving from side to side, and after he struck him[,] he knew he should have stopped."
At 11:58 that morning, Corporal Matthews obtained a search warrant to test Defendant's blood. A paramedic drew Defendant's blood at 12:56 p.m. and the tests showed the presence of citalopram. From the accident, officers charged Defendant with felony hit-and-run and failure to cede safe movement.
Plaintiff testified on his own behalf. On 26 September 2013, Plaintiff hung out with his roommate, and the two caught up after Plaintiff's trip to California. After dinner, they planned to head to the beach to meet other friends. Plaintiff did not drink any alcohol before leaving.
Around 11 p.m., the two were ready to leave. Before leaving, they checked their bicycles. Plaintiff's bike had a headlight on the front, reflectors on the back, and a reflective strip on the back of the seat. However, the bicycle did not have a working taillight, and he did not wear a helmet.
The ride to Jerry Allen's is about four miles and took about twenty to thirty minutes. While at Jerry Allen's, Plaintiff had "a few" or "three, maybe four" beers. However, he did not feel intoxicated. The group went to the beach for a swim. After thirty to forty minutes, the group returned to Jerry Allen's.
Around 2 a.m., the group said their goodbyes. Plaintiff began to ride his bicycle home. Specifically, Plaintiff rode in the right-hand lane, on the white shoulder line and did not swerve. Although he remembered riding his bike down the road, he did not recall being hit. The next thing Plaintiff remembered was being in the hospital.
Plaintiff called Daniel Johnson. On 26 September 2013, Johnson, Defendant, and Stuart Gibbs hung out. Around 8 p.m., the three smoked marijuana.[7] Defendant told Johnson he took a Vyvanse that night.
Around 11 p.m., the three left to go to bars and brought marijuana for the outing. Defendant drove the three to 22 North, a bar. While there, Defendant and Johnson did not stay together, as Defendant hung out with his fraternity brothers.[8]
When the bar closed at 2 a.m., Defendant and Johnson left. Defendant drove the two in his car, while Johnson slept in the passenger seat. Johnson awoke to Defendant slapping him on the chest and saying, "Hey, look at this guy, look at this guy." The "guy" was Plaintiff. About twenty seconds later, Defendant struck Plaintiff.
Defendant continued driving about halfway up a bridge and stopped. Defendant and Johnson thought they saw Plaintiff get up and "it looked like he had thrown something." Defendant feared being breathalyzed, being charged for driving while impaired, and that officers would find marijuana in his car. Johnson told Defendant to turn around, but Defendant did not and, instead, he hurriedly left.
At some point, Defendant and Johnson became aware an officer was following them. To that, Defendant said, "F it." Defendant turned a few times, and the officer turned on his lights. Defendant pulled into a Target store parking light.[9] After pulling over, an officer came to the car. The officer told Defendant "it smelled like alcohol[.]" Defendant told the officer he consumed two beers, but Johnson knew Defendant actually drank more than that.
Officers brought Johnson to the Wrightsville Beach Police Department. The next morning, Frank Jones, an attorney, called Johnson and told him he represented Defendant. Jones told Johnson "[Defendant]'s version of events[.]"[10] Johnson called the police department and "offer[ed] a story covering for [Defendant.]"
On cross-examination, the following exchange occurred:
A. All I remember is him slapping me on the chest, "Hey, look at this guy." I looked, boom, it happened.
Q. So do you have any recollection at all as to [Plaintiff]'s movements? Was he swerving, was he going in a straight line?
A. When I was brought to the attention of [Plaintiff], it looked like he was swerving a little bit, and that maybe that's because of me being intoxicated.
Q. Okay. It sounds like you just don't know. You don't really have a good idea one way or the other what [Plaintiff]'s movements were. Is that fair?
A. That's-that's-seems fair, but I'm trying to remember as hard as I can.
Plaintiff called Valerie Blanton, a captain with the Wrightsville Beach Police Department. Captain Blanton participated in the follow-up investigation for the accident, for which officers viewed a videotape of the incident. The video was taken by a nearby store's security system. Captain Blanton first viewed the video on the store's screen and then recorded the video playing on the screen on her cell phone. Plaintiff again played the video to the jury.
In the video, Blanton saw a "dark-colored passenger vehicle traveling in westbound [sic ] in the far outside lane as it approaches the beach, or the boat access exit there. And there's a bicyclist in front of it, and it strikes the bicyclist." Blanton did not see the bicyclist make any abrupt movements. After striking the bicyclist, the driver of the car continued driving, slowed down, but did not stop.
Plaintiff rested.[11] Defendant moved for directed verdicts for negligence and any claims to punitive damages. The trial court denied the motions.
Defendant called Dr. Kevin Potts, an emergency room doctor at Eastern Carolina Emergency Physicians. During the early morning of 27 September 2013, Dr. Potts treated Plaintiff at the emergency department of New Hanover Regional Center. Without objection, Defendant admitted Plaintiff's medical records into evidence. The records set out the following.
At 3:07 a.m., Plaintiff arrived, via EMS transport. Plaintiff admitted to "ETOH", which is alcohol, and the reports indicated a "yes" response to alcohol. Dr. Potts further noted Plaintiff "appear[ed] under the influence of alcohol." That notation could mean, "that [he] witnessed something during the evaluation that made it-made [him] believe that [Plaintiff] was under the influence of alcohol. That could be smelling alcohol, that could be noticing some slurred speech, some slight inappropriate movements or the like." However, Dr. Potts did not have an "independent" recollection of the visit and could not say why, specifically, he concluded Plaintiff was under the influence of alcohol. Dr. Potts opined alcohol can affect the ability to ride a bicycle in a safe manner.
Defendant rested. Plaintiff moved for a directed verdict on both contributory negligence and gross contributory negligence. The court denied the motions. Defendant renewed his motions for directed verdict on negligence and "all the negligence-related issues." The trial court also denied these motions.
During the charge conference, Plaintiff objected to the "the reckless driving and the willful and wanton on the plaintiff[.]" The trial court instructed the jury on reckless driving.[12] The trial court also instructed the jury, inter alia :
When evidence has been received tending to show that at an earlier time, a witness made a statement which may be consistent with or may conflict with his testimony at trial, you must not consider the earlier statement as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial.
If you believe that such earlier statement was made and that it was consistent with or does conflict with the testimony of the witness at this trial, then you may consider this together with all other facts and circumstances bearing upon the witness' truthfulness in deciding whether you will believe or disbelieve his testimony.
During deliberations, the jury submitted two requests: (1) a written copy of the jury instructions; and (2) to know "the process for reexamining the evidence[.]" The court printed the jury instructions and informed the jury how to request exhibits. The jury sent a second note, asking, inter alia , to see the videotape of the collision and to be able to pause the videotape. For that exhibit, the following conversation occurred between counsel and the court:
[PLAINTIFF'S COUNSEL]: I don't think that was admitted into evidence.
THE COURT: Okay. So it's not an exhibit.
[PLAINTIFF'S COUNSEL]: It was just viewed by the captain.
[DEFENDANT'S COUNSEL]: I-and I don't think I moved to introduce it myself.
THE COURT: Do you have that on the evidence list?
THE CLERK: No, it was not offered in.
[DEFENDANT'S COUNSEL]: I'm happy to stipulate to its admissibility, if that's even possible.
THE COURT: Number one, then, not an exhibit, so they don't have the right to see it.
The jury returned to the courtroom, and the trial court informed the jury:
First thing you requested was opportunity to see the Redix video and that you would control the pause of the video. That video, although it was displayed during the examination of one or more witnesses, was not introduced into evidence. So since it's not an exhibit, I don't have any authority to make provisions for you to see it at this point.
On 18 April 2017, the jury found the following: (1) Defendant's negligence injured Plaintiff; (2) Plaintiff, by his own negligence, contributed to his own injury; (3) Defendant did not have the last clear chance to avoid Plaintiff's injury; (4) Defendant's willful or wanton conduct injured Plaintiff; and (5) Plaintiff contributed to his own injury by willful or wanton conduct.
On 12 May 2017, the court entered a judgment, decreeing Plaintiff "take nothing by this action[.]" The same day, Defendant filed a motion for costs, totaling $7,739.83. For this amount, Defendant attributed $1,218.65 to costs for Dr. Potts deposition[13] and $2,150.00 for costs for Dr. Potts's deposition and expert service fees.[14]
On 23 May 2017, Plaintiff filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial. Plaintiff contended Defendant failed to offer any evidence "that any action or inaction of the Plaintiff was the proximate cause of his injuries." Plaintiff also argued Defendant's counsel, George Simpson, engaged in prohibited ex parte communications. In support of his alternative motion for new trial, Plaintiff pointed to allegedly false testimony from Defendant's witness, Dr. Potts.
On 2 June 2017, the court held a hearing on the parties' motions. The court first heard arguments from both parties on Plaintiff's motion for judgment notwithstanding the verdict. The court ruled:
I am denying the motion for JNOV. I see it as more evidence of contrib than the fact that the defendant had been-or the plaintiff, rather, had been drinking. You do have evidence he had been drinking. There was evidence, whether the jury believed it or not, the plaintiff was swerving. There was evidence the plaintiff was wearing dark clothing riding a bicycle at 2:30 in the morning. And although the rules of the road at that time did not require that he have a lighted taillight on his bicycle, still looking at what a reasonable person would do under those circumstances, I think in combination that's at least a little bit more than a scintilla of evidence that the plaintiff was negligent and that negligence contributed to his injuries.
Plaintiff alleged Simpson's ex parte communication and conspiracy with Dr. Potts required a new trial. The court orally denied Plaintiff's motion and concluded it did not "see it being sufficient evidence to-... to believe that there was ex parte communications other than those authorized by rules of professional conduct." The court granted Defendant's costs incurred prior to 6 December 2016 and all costs pursuant to the offer of judgment, excepting costs related to Dr. Potts. On 12 June 2017, the court entered an order, in accordance with its oral rulings. On 7 July 2017, Plaintiff filed timely notice of appeal.
II. Standard of Review
We apply three separate standards of review to examine Plaintiff's appeal.
First, we use the same standard of review for the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict. Tomika Invs., Inc. v. Macedonia True Vine Pentecostal Holiness Church of God, Inc. , 136 N.C. App. 493, 498-99, 524 S.E.2d 591, 595 (2000) (citation omitted). The standard is "whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." Davis v. Dennis Lilly Co. , 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991) (citing Kelly v. Int'l Harvester Co. , 278 N.C. 153, 179 S.E.2d 396 (1971) ).
In determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor.
Turner v. Duke Univ. , 325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989) (citation omitted).
There must be more than a "scintilla of evidence supporting each element of the non-movant's claim." Denson v. Richmond Cty. , 159 N.C. App. 408, 412, 583 S.E.2d 318, 320 (2003) (quotation marks and citation omitted). "A scintilla is some evidence, and is defined by this Court as very slight evidence." Mace v. Pyatt , 203 N.C. App. 245, 251, 691 S.E.2d 81, 87 (2010) (quotation marks and citation omitted). "If there is evidence to support each element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for [JNOV] should be denied." Green v. Freeman , 367 N.C. 136, 140-41, 749 S.E.2d 262, 267 (2013) (quotation marks and citation omitted) (alteration in original). We review the trial court's denial de novo . Denson , 159 N.C. App. at 411, 583 S.E.2d at 320 (citation omitted).
Second, " 'the trial court has wide discretion in presenting the issues to the jury and no abuse of discretion will be found where the issues are sufficiently comprehensive to resolve all factual controversies and to enable the court to render judgment fully determining the cause.' " Robinson v. Trantham , 195 N.C. App. 687, 691, 673 S.E.2d 771, 774 (2009) (alteration omitted) (quoting Lord v. Customized Consulting Specialty, Inc. , 182 N.C. App. 635, 645, 643 S.E.2d 28, 34 (2007) ).
Third, "an appellate court's review of a trial judge's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge." Worthington v. Bynum , 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982) (citations omitted). "Consequently, an appellate court should not disturb a discretionary Rule 59 order unless it is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." Id. at 487, 290 S.E.2d at 605. However, if the motion for a new trial is based on an error in law occurring at the trial and objected to by the party making the motion, our Court reviews de novo . Greene v. Royster , 187 N.C. App. 71, 78, 652 S.E.2d 277, 282 (2007) (citations omitted).
III. Analysis
Plaintiff contends the trial court erred in three ways: (1) denying his motions for directed verdict and judgment notwithstanding the verdict; (2) instructing the jury on reckless driving; and (3) denying his motion for new trial. We address his arguments in turn.
A. Motions for Directed Verdict and Judgment Notwithstanding the Verdict
Plaintiff first asserts the court erred in denying his motion for directed verdict and subsequent motion for judgment notwithstanding the verdict. Specifically, Plaintiff argues Defendant failed to present more than a scintilla of evidence Plaintiff acted negligently or grossly contributorily negligently or any proximate causation. We disagree.
"In order to prove contributory negligence on the part of a plaintiff, the defendant must demonstrate: (1) a want of due care on the part of the plaintiff; and (2) a proximate connection between plaintiff's negligence and the injury." Daisy v. Yost , --- N.C. App. ----, ----, 794 S.E.2d 364, 366 (2016) (quotation marks, alteration, and citation omitted). While contributory negligence by a plaintiff is sufficient to bar recovery from a defendant committing ordinary negligence, the standard is different for gross negligence. McCauley v. Thomas , 242 N.C. App. 82, 89, 774 S.E.2d 421, 426 (2015) (citation omitted). "Only gross contributory negligence by a plaintiff precludes recovery by the plaintiff from a defendant who was grossly negligent." Id. at 89, 774 S.E.2d at 426 (citation omitted). Gross negligence is also referred to as "willful and wanton" negligence.
An act is wanton when it is done of wicked purpose or when done needlessly, manifesting a reckless indifference to the rights of others. An act is wilful when there exists a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, a duty assumed by contract or imposed by law.
Id. at 89-90, 774 S.E.2d at 426 (quoting Boyd v. L.G. DeWitt Trucking Co., Inc. , 103 N.C. App. 396, 402, 405 S.E.2d 914, 918 (1991) ).
"In the area of motor vehicle negligence, ... the gross negligence issue has been confined to circumstances where ... (1) [the person] is intoxicated; (2) [the person] is driving at excessive speeds; or (3) [the person] is engaged in a racing competition[.]" Yancey v. Lea , 354 N.C. 48, 53-54, 550 S.E.2d 155, 158 (2001) (internal citations omitted).
"[S]ince negligence usually involves issues of due care and reasonableness of actions under the circumstances, it is especially appropriate for determination by the jury." Radford v. Norris , 74 N.C. App. 87, 88-89, 327 S.E.2d 620, 621-22 (1985) (citation omitted). "In 'borderline cases,' fairness and judicial economy suggest that courts should decide in favor of submitting issues to the jury." Id. at 89, 327 S.E.2d at 622 (citation omitted).
Viewed in the light most favorable to Defendant, the non-movant, the evidence presented raises more than a conjecture of ordinary contributory negligence and gross contributory negligence. While Plaintiff asserts Defendant presented no evidence of causation between Plaintiff's intoxication and the accident, a thorough review of the record indicates otherwise. Indeed, Dr. Potts opined alcohol can affect the ability to ride a bicycle in a safe manner. While perhaps not the strongest evidence, this evidence was sufficient for the matter to go to the jury. Cf. Efird v. Hubbard , 151 N.C. App. 577, 580, 565 S.E.2d 713, 716 (2002) (holding the trial court properly granted summary judgment in favor of defendant when plaintiff failed to produce any evidence establishing defendant's intoxication had a causal relationship to the accident). See Green v. Rouse , 116 N.C. App. 647, 651, 448 S.E.2d 846, 848 (1994) (holding the trial court properly submitted the issue of contributory negligence to the jury where defendant produced evidence of plaintiff's intoxication and stating "[t]he jury could properly consider such evidence while ascertaining whether plaintiff's condition caused her to 'operate [her] vehicle in a manner which was a proximate cause of the collision' ") (alteration in original). See also Garmon v. Hagans , No. COA13-441, 2013 WL 6669124, at *6 (unpublished) (N.C. Ct. App. Dec. 17, 2013) (holding the trial court properly denied plaintiff's motions for directed verdict and judgment notwithstanding the verdict regarding contributory negligence where there was evidence of defendant's intoxication and defendant acknowledged "he had drunk enough to affect his driving").[15]
As with other "borderline cases," both "fairness and judicial economy suggest" we decide in favor of submitting the issue to the jury. Radford , 74 N.C. App. at 89, 327 S.E.2d at 622 (citation omitted). See also Brown v. Wilkins , 102 N.C. App. 555, 557, 402 S.E.2d 883, 844 (1991) (citing Radford ).
On the cold record before our Court, we conclude Plaintiff's argument regarding proximate causation is unavailing. Accordingly, we affirm the trial court's denial of Plaintiff's motions for directed verdict and judgment notwithstanding the verdict with regard to ordinary contributory negligence. Additionally, Defendant presented sufficient evidence of causation and Plaintiff's intoxication. Although, were we the jurors, we may have come to a different result, we are not the fact-finder, and we are required to defer to the collective wisdom of the jury. Hensley v. N.C. Dep't of Env't and Natural Res. , 364 N.C. 285, 294, 698 S.E.2d 41, 47 (2010) (citation omitted) (stating this Court may not engage in fact-finding, as it is not the role of the appellate courts).
Finally, we note Plaintiff did not present any argument on last clear chance during his directed verdict argument, at the judgment notwithstanding the verdict hearing, or on appeal.[16] Thus, we do not reach this issue, as it is not for this panel to make arguments for counsel. Viar v. N.C. Dep't of Transp. , 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005) ("It is not the role of the appellate courts, however, to create an appeal for an appellant.").
Consequently, we affirm the trial court's denial of Plaintiff's motions for directed verdict and judgment notwithstanding the verdict with regard to gross contributory negligence.
B. Jury Instruction on Reckless Driving
Plaintiff next contends the trial court committed reversible error by instructing the jury on reckless driving.
N.C. Gen. Stat. § 20-140 defines reckless driving:
(a) Any person who drives any vehicle[17] upon a highway or any public vehicular area carelessly and heedlessly in willful or wanton disregard of the rights or safety of others shall be guilty of reckless driving.
(b) Any person who drives any vehicle upon a highway or any public vehicular area without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property shall be guilty of reckless driving.
N.C. Gen. Stat. § 20-140 (2017).
Plaintiff points to a plethora of evidence of his own safe driving; however, there is also sufficient evidence of Plaintiff's willful or wanton driving, as detailed supra , to support the jury instruction. Accordingly, this argument is without merit.
C. Motion for New Trial
Finally, Plaintiff argues the court erred by denying his alternative motion for a new trial. Specifically, Plaintiff contends Defendant's attorney, George Simpson, engaged in unauthorized ex parte communication with Plaintiff's treating physician, Dr. Potts.
At the hearing, the court stated:
And in its discretion, the court is going to deny the Rule 59 motion and not grant a new trial. I just don't see it being sufficient evidence to-for me to believe that there was ex parte communications other than those authorized by rules of professional conduct. And aside from the doctor's testimony, the plaintiff had some significant obstacles to overcome to get a verdict. So in my discretion I am denying that motion.
Our Supreme Court addressed ex parte communications in Crist v. Moffat , 326 N.C. 326, 389 S.E.2d 41 (1990). In Crist , the Court summarized "the gravamen of the issue" as "not whether evidence of plaintiff's medical condition is subject to discovery, but by what methods the evidence may be discovered." Id. at 336, 389 S.E.2d at 47. The Supreme Court considered "patient privacy, the confidential relationship between doctor and patient, the adequacy of formal discovery devices, and the untenable position in which ex parte contacts place the nonparty treating physician[.]" Id. at 336, 389 S.E.2d at 47. With those considerations in mind, the Court held "defense counsel may not interview plaintiff's nonparty treating physicians privately without plaintiff's express consent." Id. at 336, 389 S.E.2d at 47. The North Carolina State Bar issued an ethics opinion, stating the same.[18] Ethics Op. RPC 162 (July 21, 1994).
In support of his argument, Plaintiff points to Dr. Potts's testimony and Defendant's request for costs.[19] Specifically, Plaintiff highlights portions of Dr. Potts's testimony in which Dr. Potts testified regarding Plaintiff's intoxication, even though the trial court excluded the impairment test. In his motion for costs, Defendant attached an invoice for "Legal Service" from Dr. Potts. In this invoice, Dr. Potts listed several phone calls with Mr. Simpson.
At the hearing on his motion for a new trial, Plaintiff did not submit any evidence and presented only argument. Similarly, Mr. Simpson presented only argument, defended his actions, and asserted he acted within case law and the applicable ethical rules.
On appeal, Plaintiff asserts "[w]ithout question, 100 minutes of ex parte communication between Defense counsel and Plaintiff's treating physician requires a new trial[.]" Plaintiff also asserts Mr. Simpson's statements regarding the phone calls were not evidence contradicting Plaintiff's argument, as statements of counsel are not evidence. See State v. Swimm , 316 N.C. 24, 32, 340 S.E.2d 65, 70-71 (1986) (citation omitted).
While Plaintiff is correct statements of counsel are not evidence, Plaintiff, himself, also did not submit any evidence at the hearing to support his allegations. Below, and on appeal, Plaintiff asserts, without supporting evidence, Defendant's invoice-alone-proves misconduct by Mr. Simpson sufficient to warrant a new trial. As the trial court concluded, we also conclude Plaintiff failed to present sufficient evidence to warrant a new trial and affirm the trial court's order in this regard.[20]
IV. Conclusion
For the reasons stated above, we affirm the trial court's order and judgment.
AFFIRMED.
Report per Rule 30(e).
Judges ELMORE and DAVIS concur.

Defendant objected to Plaintiff's tendering of Officer Lippert as an expert, and the court overruled the objection.

Klonopin is a central nervous system depressant.

Vyvanse is a central nervous system stimulant.

This language is from Plaintiff's counsel's questioning, to which Lippert answered affirmatively.

Plaintiff played the video of Defendant's processing to the jury. Neither party moved to admit the video into evidence.

The contents of the accident report are encapsulated in Corporal Matthews's testimony.

At a prior deposition, Johnson stated they smoked marijuana "right before [they] went out."

At trial, Johnson could not state how many alcoholic drinks Defendant consumed. However at the prior deposition, Johnson stated Defendant drank "three to four" drinks.

At his deposition, Johnson stated while the officer had his blue lights on, Defendant kept driving in an effort to hide marijuana.

This language is from Plaintiff's counsel's questioning, to which Johnson answered affirmatively.

Plaintiff also called several witnesses to testify as to damages, which is not at issue on appeal. Accordingly, in the interest of brevity, those testimonies are not included in this opinion.

The trial court used the pattern jury instruction for reckless driving. N.C.P.I.-Civ. 207.10.

This amount was attributed to Dr. Potts's and another witness's depositions.

Dr. Potts calculated his fees as follows:
?

In Garmon v. Hagans , the question before this Court was whether defendant produced sufficient evidence to allow the jury to determine "whether defendant's consumption of alcohol caused or contributed to the accident and whether plaintiff knew or should have known that defendant was impaired." 2013 WL 6669124, at *6.

See Hofecker v. Casperson , 168 N.C. App. 341, 349-50, 607 S.E.2d 664, 669-70 (2005) (Tyson, J., dissenting), rev'd per curiam per the dissent , 360 N.C. 159, 662 S.E.2d 489 (2005) (summary judgment for defendant proper on last clear chance issue where plaintiff alleged, solely, defendant's "vehicle struck plaintiff while plaintiff was located somewhere in the roadway"). The dissenting judge stated "[t]his allegation, standing alone, without a forecast of evidence to show defendant failed to maintain a proper lookout or that he could have avoided the accident is insufficient to withstand a motion for summary judgment." Id. at 349, 607 S.E.2d at 669. The dissenting judge gave examples of what plaintiff could have forecasted evidence of to survive the motion for summary judgment: (1) defendant drove at a greatly excessive speed; (2) defendant had a view of 1,200 to 1,500 feet, or other distances, before the accident; (3) defendant could have moved if he saw plaintiff and avoided the accident; (4) defendant was preoccupied or distracted; or (5) defendant failed to abide by rules of the road or was in the wrong lane. Id. at 349, 607 S.E.2d at 669 (internal citations omitted).

N.C. Gen. Stat. § 20-4.01 (49) (2017) includes a bicycle in the definition of "vehicle."

We note in RPC 162, the State Bar, in inquiry # 4, explicitly approved an attorney communicating with the plaintiff's nonparty treating physician "in order to arrange the physician's appearance at the trial as a witness." Ethics Op. RPC 162.

A motion for new trial pursuant to Rule 59(a)(8) requires the moving party to object to the alleged error of law at trial. At trial, during the non-contested portion of Dr. Potts's testimony, Plaintiff's counsel did not explicitly object. Instead, he asked to be heard outside the presence of the jury, stated he was "tempted to ask for a mistrial[,]" requested corrective instructions for the jury, and asked the court to strike the testimony. Additionally, we note this testimony happened during Plaintiff's cross-examination of Dr. Potts and was not testimony elicited by Defendant.

In his motion for new trial, Plaintiff did not specify under which subsection of Rule 59 he moved. From the language of his motion, it seems Plaintiff asserted arguments under subsections (a) (5), (7), and (8). However, on appeal, Plaintiff only brought forth argument regarding subsection (a)(8), asserting an error in law. Thus, we conducted de novo review.